MERRILL v. W. BICKFORD CO.

(District Court, D. Maine. August 6, 1919.)

No. 779.

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—METHOD OF MAKING MOCCASIN SHOES.
     The Merrill patent, No. 1,231,183, for a method of making moccasin shoes, was not anticipated and discloses invention; also held infringed.
2. PATENTS ☞172—CONSTRUCTION—SCOPE.
     When a patentee describes an invention or machine, he is understood to claim and does by law cover, not only the precise forms he has described, but all other forms which embody the invention.

In Equity. Suit by Harry E. Merrill against the W. Bickford Company. Decree for complainant.

Woodman & Whitehouse and Solomon W. Bates, all of Portland, Me., for complainant.

McGillicuddy & Morey, of Lewiston, Me., and Elgin C. Verrill, of Portland, Me., for defendant.

HALE, District Judge. This bill in equity alleges infringement of letters patent of the United States, No. 1,231,183, granted June 26, 1917, application filed December 15, 1915, for method of constructing moccasin shoes. The plaintiff alleges infringement of the five claims of the patent. The defendant denies infringement, and says that the patent is invalid, especially by reason of anticipation in the prior unpatented art.

The subject of the controversy is the manner of making a moccasin shoe. Such shoe was first made by the American Indian, substantially as follows: A piece of leather considerably larger than the outline of the foot formed its sole. This piece was applied to the bottom of a last; the edges were turned up around the sides of the last; the tip was then sewed to the upper edge of the turned-up portion of the bottom to form the upper portion. In this old process, the tip fits the top of the last closely; the distance around the outer edge is very much less than the distance around the corresponding edge of the bottom piece. The only way by which the two opposite edges of the tip and the bottom could be sewed together was by puckering the edge of the bottom, so as to contract it in length to fit the outer edge of the top. In making the moccasin, the Indian turned up the forward end of the bottom and tacked it to the last at the central point of the toe. He then began at the rear edge of the tip, at the side of the last, and sewed toward the toe, taking much longer stitches in the edge of the bottom than in the edge of the tip; the result was a puckering of the edge of the bottom and a contraction in its length, to make it equal to the length of the edge of the tip. By continued practice the expert operator was enabled to judge the length of the stitch required in the outer, or bottom, parts, so that, when the center of the toe was reached, there would be no pucker in the bottom part and the stitches would be substantially even; this required time and experience. The plaintiff points out that he sought to avoid the necessity of employing experienced and expensive labor to make the moccasin on the old plan; that he sought to effect an economy of labor by the process which he invented, especially since leather has become expensive. He says that, to form the bottom of the moccasin, according to the old method, a large piece of leather of good quality was required, since the central part of the bottom piece constituted also the sole of the moccasin where the greater part of the wear came; that there was a considerable waste of leather, caused by the puckering in of material where the bottom was united to the tip; all the material constituting puckers being waste material. He points out, further, that it is desirable to have the sole of the moccasin, or central part of the bottom piece, as thick as possible, while that part which is gathered in and sewed to the tip is better, if pliable and flexible, and that these facts were accentuated when it became the practice to apply a rigid outer sole to the bottom of the moccasin; that the present patent has its more particular application to the tip of the moccasin, where there is such outer sole, and where the moccasin system of construction is used for a heavy boot adapted for rough use. He says it is apparent that the sole piece may be made the entire length of the sole of the foot, or it may be limited to the forward part of the foot,

since the peculiarities of the construction relate entirely to the toe and the forward portion of the moccasin.

He points out that, by the process employed in his patent, the bottom of the moccasin, including the portion turned up around the sides of the last, instead of being made of a single piece as heretofore, is made of two pieces, namely, a sole piece, which is preferably the size and shape of the bottom of the foot, and a vamp, so called, which is preferably of a substantially straight strip of leather. One of the edges of the vamp is stitched to the outer edge of the sole piece, following around the toe so that the vamp assumes an upstanding or substantially vertical position around the sole. The last is now introduced, and the vamp, which forms the sides or edges, is fitted around the last; the tip is placed in position on top of the last, and sewed by hand to the upper edge of the vamp, as in the old moccasin. It will be seen, however, that the edge of the vamp, where it joins the edge of the tip, is not much longer than the corresponding edge of the tip, so that, in stitching the two edges together, the edge of the vamp is puckered but very little. This process is continued, and the shoe is completed by building up the rear position of the shoe in any well-known manner of constructing a shoe and by applying an outer sole. He contends that his process, as above substantially described, is new and useful, as well as economical, and that it is the first departure from the old process.

The specification recites the old method of manufacture, and its faults:

"In making the common type of moccasin, the sole and vamp is formed of a single piece of buckskin, or other flexible leather, which is puckered by hand and drawn back over the last, and the upper portion of the moccasin is then secured thereto, so that the resulting moccasin structure is made up, essentially, of the lower continuous sole and the vamp member, extending up around the sides of the moccasin, and the member which forms the top of the moccasin between the upper edges of the sole and vamp member and around the ankle. Such constructions involve using relatively large pieces of leather or buckskin for the sole and vamp member, much larger than corresponds to the actual area of the member in the completed construction, because of the gathering and puckering of this member where sewed to the upper. Moreover, such constructions not only are uneconomical for this reason, but there is considerable loss and waste of small odd pieces of the leather from which the bottom is made. It is furthermore necesary to use the highest grade material for these bottom sole and vamp members, because of the wear that must be withstood by the sole, even though much less wear comes upon the vamp portion; and such structures are uneconomical for this reason also. The present invention relates to a novel and improved method of constructing moccasin shoes, whereby such disadvantages of the old constructions are largely overcome or minimized, and whereby, furthermore, the moccasin can be made with a small amount of time and labor, and whereby, finally, an economy of the leather is effected and waste thereof minimized."

The patentee in his specifications points out further advantages which he claims for his improved method:

"In constructing the novel moccasin of the present invention, the sole and vamp members are separately cut, and need not be of the same material. The upper part of the moccasin is usually made of two members, which can be preliminarily joined together * * * before the upper is secured to the rest of the structure. A flexible member will also in practice * * * extend up

between the front opening of the upper member, being commonly secured also to that member.

"The sole and the vamp are first secured together, by stitching, cementing, or otherwise, so that the end seam of the vamp member comes in the middle of the moccasin, and advantageously also at the inside of the moccasin, where it will be subjected to less wear. This securing of the vamp to the sole can readily be effected by first stitching or fastening one end of the vamp to the sole, and then continuing around the sole with the vamp until the ends of the vamp can be secured together. This attaching of the vamp to the sole eliminates the heel seam, and all other seams except the single seam at or near the middle of the moccasin. Where a two-piece vamp is used, both seams should be near the middle of the moccasin; but by the use of a one-piece vamp, only one seam is necessary.

"It will be noted, also, that the vamp is a narrow strip, and that, by attaching this strip to the sole in the manner indicated, the vamp is caused to turn up into the desired position, so that it forms a substantially right angle with the sole. The shaping of the vamp to the sole is accomplished by springing the vamp to make it conform to the outline of the sole, which, in turn, is trimmed so that it conforms to the last. When the sole has been thus fitted, and the vamp has been made to conform thereto, and has been secured thereto, the last is inserted, and the vamp is fitted and made to conform to the last, thus giving to it the desired shape.

"After the vamp has been thus formed, the upper is secured thereto. This securing of the upper and vamp does not require any appreciable puckering and gathering of the vamp, such as has been the common practice, and in fact necessary, with moccasins as commonly constructed."

[1] The substance of the invention is stated in claim No. 1:

"The method of constructing moccasin shoes which comprises first securing a vamp to a sole, inserting a last, shaping the vamp to the last before an upper is attached, and subsequently attaching the upper to the vamp to complete the moccasin."

It will be seen that the claim involves four elements. First, securing the vamp to the sole; second, putting in the last; third, shaping the vamp to the last before the upper is attached; fourth, attaching the upper to the vamp.

The four other claims are more in detail, but present the same process.

In order to sustain the patent, the court must, of course, find that the patent involves invention, and not merely the skill of the mechanic. In Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed: 1177, Mr. Justice Bradley laid down the rule, although not the invariable rule, that if a new combination of known elements produce a new result, never attained before, it is evidence of invention.

In Atlantic Works v. Brady, 107 U. S. 192, 200, 2 Sup. Ct. 225, 231 (27 L. Ed. 438), the same learned Justice had already delivered the opinion of the court, which Mr. Walker says is now a classic. In that opinion he says:

"To grant to a single party a monopoly of every slight advance made, except where the exercise of invention, somewhat above ordinary mechanical or engineering skill, is distinctly shown, is unjust in principle and injurious in its consequences.

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling de-

vice, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures."

In the case at bar, the patentee started with what the Indian, and his successors in the art, had done in making a moccasin shoe; and it does not appear that there had ever been any substantial improvement on the picturesque, but painful, process of the Indian. This patentee was not a pioneer in his art. He did not, perhaps, make a great step in advance; but I think the title of inventor ought not to be denied him. His method cannot be said to be a mere trifling device, which must have spontaneously occurred to any mechanic skilled in the art. By means described in his specifications, and set forth in claim 1 of his patent, he did, I believe, produce a new and beneficial result, which is entitled to take its place among inventions. In a familiar article of simple mechanism he made an improvement, by overcoming difficulties and objections, however slight, that had been present for a long time in the manufacture of the subject of his patent. In Albright v. Langfeld (C. C.) 131 Fed. 473, 475, the District Court for the Eastern District of Pennsylvania has cited a long list of cases containing old and well-known examples of patented inventions which have been upheld by the courts, although they differed very little in form, mechanism, or operation from well-known appliances.

The defendant raises no question of anticipation in the prior patented art. A sharp contention, however, is made, involving anticipation by prior use in the unpatented art. Four different cases of alleged anticipations are presented:

(1) The defendant says that Louis Sarazin, of Lewiston, has for more than 30 years made moccasins in the manner substantially as set forth in the plaintiff's patent. It has already been found that the Indian and his successors in the art made a moccasin by taking for the moccasin's bottom, or sole, a piece of leather considerably larger than the outline of the foot; that they applied this piece to the bottom of the last, turned up the edges around the sides of the last, and sewed a tip to the upper edge of the part turned up to form the upper portion of the moccasin. This, of course, resulted in puckering.

The process employed by the plaintiff was to avoid the puckering by taking two pieces, namely, a sole piece, of the shape of the bottom of the foot, and by stitching the outer edge of this sole piece to a vamp, substantially a straight piece of leather, and then making the edge of the sole piece follow around the toe, so that the vamp assumes an upstanding position around the sole. The last is then introduced, and the vamp is fitted around the last, and the tip is fitted into position around the top of the last, and sewed by hand to the outer edge of the vamp; the edge of the vamp, where it joins the edge of the tip, not being much longer than the upper end of the tip. On examination of the testimony it is clear that Sarazin did precisely what the Indian and his successors did; he made his moccasins from a one-piece solid bottom, like the old-fashioned moccasin. He did not have a two-pieced bottom. He did not escape the pucker. He did not anticipate Merrill.

(2) The defendant charges an anticipation by Francis F. Prince, of Auburn, Me., in 1904, and for several years thereafter. Prince is a traveling salesman, who was in the employ of the defendant company. The first exhibit which he produces clearly follows the method of manufacture of the Indian. The part below the tip is one piece, forming the whole bottom part of the shoe. He says that this sort of shoe, with the one-piece bottom, was made in Monmouth by the Getchell Company for many years. This shoe, with its one-piece bottom, is clearly not an anticipation.

He produces another shoe which he calls an imitation of a moccasin slipper. On examination, the slipper appears to closely resemble the plaintiff's moccasin. Upon turning to the testimony, however, it is found that this moccasin is a turned shoe. It is made of a pliable material, and produces similar result to that produced by the plaintiff. But this patent is not on the completed moccasin; it is on the series of four steps in combination, by which the moccasin was made. The stitching on this shoe of Prince was done by sewing machines, and by no process similar to that of the plaintiff. After the sewing, the shoe was turned. Clearly it is not anticipatory of the patent in suit. Prince puts in another exhibit, a felt slipper, known as the "Comfy Slipper," which, also, is a turned moccasin slipper, and clearly does not anticipate the patent in suit.

(3) It is charged, also, that the Buck Moccasin Company, of Bangor, anticipated the plaintiff's patent by making and putting out moccasins constructed in a manner similar to that set forth in the claims of the plaintiff's patent. Joseph E. Buck, representative of the Buck Company, testified that his concern made what was called their No. 31. His direct testimony indicated that he pursued the method of construction pointed out in the plaintiff's patent; but he later admitted that, instead of lasting upward from the sole to the tip, following the process described by the plaintiff, he lasted his moccasins downward like a shoe. This is the exact opposite of the plaintiff's process. It is therefore of no great consequence to inquire closely when he produced his moccasin. He also presents what he calls his "driving moccasin." This moccasin was clearly made with a one-piece bottom, and cannot be an anticipation.

(4) The defendant presents one case of alleged anticipation which involves a serious question of fact. It is charged that, in 1913, William Bickford, president of the defendant company, constructed a moccasin anticipatory of the plaintiff's patent. The substantial claim is made, therefore, that the defendant made a moccasin by the same method employed by the plaintiff, but prior to the construction of the plaintiff's moccasin, and that, therefore, the defendant's moccasin is an anticipation, and not an infringement. This brings us to a careful consideration of an important question of fact.

Nathaniel C. Small, of Auburn, a shoe manufacturer, testifies that a certain hunting moccasin, introduced in evidence, was made for him by the defendant company in 1913. He described the method of its manufacture as being similar to that employed by the plaintiff. He says that the defendant's shoe offered by the plaintiff as the offending

shoe in the case, and marked Exhibit H, was constructed in the same way. Upon examining the hunting moccasin, however, it is found that the sole of this shoe was a one-piece bottom, like the Indian moccasin. Mr. Bickford testifies that this hunting moccasin was one of two or three pairs made by him as an experiment in 1913, and that it did have a one-piece bottom like the old Indian moccasin, and that it also had an outer sole.

Mr. Bickford also offers in testimony a moccasin shoe bearing the number 40-S, and testifies that this shoe was the same shoe, involving the same method of construction, as the admitted shoe of the defendant, offered by the plaintiff as the offending shoe, and marked and referred to as Exhibit H. Bickford introduces certain order blanks, 10 in number, made out to William Bickford, Auburn, Me. He testifies that they were printed on the defendant company's letter heads, each of which contained orders to the defendant company for moccasin shoes bearing this stock number, 40-S. Substantially all of these orders were from W. G. Verplast, Bar Harbor, Me., an agent of the defendant company; the first one being dated October 22, 1914. Bickford testifies that all of these 10 exhibits were for goods actually shipped by him for the company during some months after October, 1913. He further testifies that this shoe, 40-S, was the same shoe, with the same method of construction, as Exhibit H, the admitted shoe of the defendant. He says that he began to make this shoe in 1913, and that he made it from the stock pattern, 40-S, and that he has made it from that pattern continuously down to the present time. He then describes in detail his patterns for the shoe, particularly the pattern for the filler, which is referred to throughout the testimony as K-1, and the pattern for the vamp, which is referred to as K-2. He finally, after some hesitation, fixes the time when he first got out the patterns K-1 and K-2 as January or February, 1914, and that he let his salesmen have the shoes from that pattern in the spring of 1914, and he thinks that some time in October they were offered to the public; that this shoe was substantially like the shoe to which we have referred as Exhibit H. He has no books with which to confirm his memory. Verplast himself, the defendant's agent, is not introduced; nor are any of the shoes sold on the 10 orders and carrying the stock number 40-S.

Upon this point Mrs. Maude E. Verrill is called as a witness. She is the defendant's bookkeeper. She produces two specimens of a lady's moccasin, which are marked and referred to all through the testimony as Exhibits 10 and 11. One is a light brown, and the other black. She says that in the spring of 1914, while in the defendant's factory, she stitched these moccasins, and that she thinks similar shoes were made in the latter part of 1913 "for our own use." Upon being reminded that Mr. Bickford had said that he began making these shoes, for a sample, not in 1913, but in 1914, the witness said that she would not change her testimony, that she would still insist that she began making the shoes in 1913, and that moccasins were made before the samples were put out. She testifies that both these moccasins were made early in the spring of 1914, although other shoes of similar patterns had been made experimentally in the fall of 1913. She was then asked

to fix the date more definitely when she made the shoes, and says that she knew it was in 1914, because "we made them before we had the zig-zag machine." It is shown further in the testimony that the zig-zag machine was not produced until 1915. The two shoes were shown to the court, and upon examination of one of them—No. 11—by turning back the outer sole and inner sole (or filler, as she terms it), connected with the vamp by a small narrow strip, it becomes evident that the strip is sewed to the edge of the vamp by a row of zig-zag stitching, which appears to have been done on a zag-zag sewing machine, and is precisely like the other zig-zag stitching shown to the court. It therefore appears that No. 11 shoe must have been made after the purchase of the zig-zag machine in 1915. Mrs. Verrill testifies that a lady by the name of Irish, living in Auburn, had worn the shoes, although they had been in the possession of the defendant, and that she was told by Mr. Bickford that he got the shoes from Mrs. Irish. Mrs. Irish has not been called by either party. It appears, too, that a certain Charles W. Skillings had sold the moccasins in question. Mr. Skillings is not produced as a witness.

Testimony is offered in regard to the time when the defendant obtained his patterns K–1 and K–2 for his shoe, H, which was admittedly made by him. Mr. Bickford testifies that he first had paper patterns for his moccasins, and later got metal-bound patterns from William E. Leighton, formerly of Auburn; but he does not know when he first got his metal-bound patterns for the new-style shoe. He says that at the time he went to Leighton to get his new metal-bound patterns he was not informed by him, or by any one, that his patterns were similar to Merrill's pattern, or that Mr. Merrill was going to apply for a patent. He further says that his first metal-bound pattern was the one now marked Exhibit 13 in this case, but that he does not know how long it was, after that, before the K patterns were made, but that it was not long. 13 is a very nearly straight vamp; K is curved a good deal. 13 was discontinued, because he said it cost too much. It turned up more nearly at right angles than his subsequent pattern, K.

William E. Leighton is called by the plaintiff in rebuttal. He testifies that he made the pattern Defendant's No. 13 for Bickford from the paper pattern, which was the first of that type and design that he had ever made, and that, subsequently, two or three months afterward, he made a different one now marked Exhibit K. After making defendant's pattern No. 13, he testifies that he had a talk with Mr. Bickford concerning Mr. Merrill's getting out a similar pattern; that, to the best of his recollection, he said to Mr. Bickford that the patterns, which he was having made, were similar to Mr. Merrill's. He says:

"I told Mr. Bickford that Mr. Merrill's was a pattern which produced a shoe similar to what he was trying to get here, with the toe turned up."

It appears, too, that Buck had told Bickford that Merrill's vamp was a straight piece of leather and that his first pattern 13 was straight, and that after this he changed his pattern 13 to a curved pattern, similar to Exhibit K. Leighton further testifies that Merrill brought him in a paper pattern, similar to plaintiff's introduced here as Exhibit Y, over which he and Merrill worked and made the toe fit the last a little,

and then produced the pattern, plaintiff's Exhibit Z, which he identifies by his handwriting upon it, and that, from this pattern Z, he built a metal-bound pattern for Mr. Merrill. He was then asked:

"Q. Which pattern did you make first, the metal pattern Defendant's Exhibit 13, which you made for Mr. Bickford or the metal pattern which you made for Mr. Merrill from the paper pattern Plaintiff's Z? A. I think it was for Mr. Merrill, the first one.

"Q. How long was it after you made Merrill's that you made Mr. Bickford's? A. It might have been three or four weeks.

"Q. And whether or not, Mr. Leighton, you are positive Mr. Merrill's was the first, and a period of several weeks elapsed before you made Mr. Bickford's Defendant's No. 13? A. Yes, sir."

In cross-examination, he says he thinks it was along the first of the year 1915 that he made defendant's Exhibit No. 13, and that he was sure it was not the last of the year 1914, and that it was several weeks after he made the pattern for Mr. Merrill, which he thinks was in December, 1915, and he leaves it as his final recollection that it was in December, 1915, that he made Merrill's first paper pattern Z, and several weeks after that he made Bickford's first paper pattern No. 13. Mr. Merrill had already testified that he got the metal-bound pattern the last part of 1915, or early part of 1916, rather than the first part of 1915, and fixes the time by the fact that he made application for his patent in November, 1915. Mr. Merrill had further testified that he had got out two or three experimental shoes during the summer before he put in application. In cross-examination Mr. Leighton further says:

"Q. (by Mr. Morey). And now, Mr. Leighton, did you ever see a shoe made from this pattern which you say you made for Mr. Merrill? A. I saw one made from the first one, the first pattern he brought in to me; he came in to my office with a shoe made from this one, of this pattern (indicates).

"Q. Did you ever see a shoe made by Mr. Merrill from plaintiff's Z? A. Yes, sir.

"Q. When? A. In the early part of the year 1915.

"Q. Did you see one before you had this talk with Mr. Bickford? A. Yes, sir; before I made the bound patterns."

It appears, then, that before Leighton had made any bound patterns for Bickford, like Defendant's No. 13, Merrill had brought to him (Leighton) a completed shoe made on the pattern of Z; that two or three months had elapsed between the making for defendant of pattern No. 13 and pattern K; and that the shoes in question were made from K, and not from 13. It seems to me that this testimony tends to show that it was long after the plaintiff had brought in his pattern Z, and made sample shoes from it, and filed his application for the patent, before the defendant Bickford brought in his pattern K from which his shoe H was made, and that it was at least several weeks before Bickford ever brought in his tentative pattern No. 13.

It appears, further, in testimony, that on February 24, 1916, according to the testimony of Mr. Merrill, there was a meeting in the De Witt House, at Lewiston, of moccasin manufacturers, for the purpose of forming an organization for advertising moccasins, and that two weeks before that time, in December, Merrill had filed application

for his patent. There were present at the meeting Mr. Bickford, Mr. Joseph Buck, and Mr. John Bass, of Wilton.

Merrill testifies:

"We had a meeting at the De Witt House of several of the moccasin manufacturers—at the De Witt House in Lewiston on the 24th of February, 1916 —for the purpose ostensibly of forming an organization, a moccasin week, gotten up as an advertising scheme to feature moccasins, in one of the advertising magazines known as the 'Shoe Man,' which is published in Boston.

"Q. Now, at that time, as appears by the patent, I believe you had already applied for your patent on this invention? A. Yes, sir.

"Q. Whether or not you had any talk with Mr. Bickford in relation to your having applied for such a patent or such an invention? A. Indirectly; yes.

"Q. Will you state what took place? A. Why, we were assembled there in Mr. Bosworth's room—Mr. Bickford, Mr. Buck, and Mr. Bass.

"Q. Who is Mr. Buck? A. He is a manufacturer in Bangor, Me.

"Q. Who is Mr. Bass? A. Mr. John Bass, of G. H. Bass & Co., who are moccasin manufacturers in Wilton, Me.

"Q. Is Mr. Buck a moccasin manufacturer? A. Yes, sir.

"Q. All right; go ahead. A. We were talking at the meeting, and in a general way trying to form an organization to get together, as you would call it, and in the conversation, or during the time after the business was over, we referred— I don't know whether I referred to it, or we got to talking so we brought the matter up of my patent which I had made application for; my application being put in some time in November, I figured I was perfectly safe on it, and I took the matter up and told them—explained to them what I had applied for and what I was working on developing.

"Q. You explained the idea of the invention? A. Yes, to them there, and told them I had applied for a patent, and should manufacture them as soon as I got them developed in proper shape, explained the method and process I had applied for, told them all about it, so that they wouldn't start in on anything of the kind. Mr. Buck made the statement at that time—

"Q. Was Mr. Bickford present? A. I think so.

"By Mr. Morey: Was he present when you made this statement to Mr. Buck? A. Yes; he was.

"By Mr. Whitehouse: I understood him so to state. A. Mr. Bickford was present. Mr. Buck made the statement that he was glad I spoke of it, because he was working on a shoe, on the same thing or similar, but he hadn't made an application; I told him I had applied for a patent, my application was in, and told them for the express purpose so they would keep off, and they understood it so, I am very sure.

"Q. What, if anything, did Mr. Bickford say? A. Mr. Bickford didn't say anything that I remember of about it, but immediately after, within a week or ten days, proceeded to get out a shoe along the lines that I had described to him.

"Q. Where did you find such a shoe? A. Found such a shoe on the market; he put out a shoe along those lines before I put my own out in any quantities."

Bickford testifies that he was present at the meeting, but denies that Merrill made the talk to him (Bickford) about the invention; he admits that Buck told him of the conversation. Buck testifies this:

"Q. Now, then, what did Mr. Merrill say to you gentlemen in that interval? A. He said he had either applied or had a patent to make a moccasin from a straight piece of leather. I asked him if he would describe it, and he said he would, and he described it as a straight piece of leather."

It will be seen that Bickford claims to have begun working on his new vamp in January or February, 1914, and was putting them on the market in October, 1914. He must have been making these shoes from some pattern. The only patterns in testimony—the only patterns any-

where on the horizon—are the patterns to which I have already referred. The testimony seems to me to tend to show that, at the De Witt House meeting, in February, 1916, Bickford learned of Merrill's invention and of his application for the patent, and that he immediately started out to put before the public a moccasin made from patterns which he had procured in imitation of Merrill's pattern. Leighton's best recollection of the time which elapsed between the making of Merrill's pattern and Bickford's pattern was "several weeks," and this might bring the time when Bickford first came in to Leighton with his paper pattern 13 in February, whereas the testimony tends to show that Merrill came in with his pattern Z in December. The burden is upon the defendant to show anticipation in the prior unpatented art. I cannot escape the conclusion that he has not met this burden. The testimony tends, rather, to show the contrary, as I have above indicated. I am drawn to this conclusion by applying the settled law to the subject. In Emerson & Norris v. Simpson Bros. Corporation, 202 Fed. 747, 750, 121 C. C. A. 113, 116, in speaking for the Circuit Court of Appeals, Judge Putnam says:

"It is necessary that the anticipation should be supported, not merely by the testimony of one or numerous witnesses relative to matters many years previous, but by concrete, visible cotemporaneous proofs which speak for themselves."

Judge Putnam further says that evidence of anticipation must, at least, meet the expression in Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657, namely, "That the proof must at least establish a clear conviction," and that it must be equal to that which was required in Maxwell Land Grant, 121 U. S. 325, 7 Sup. Ct. 1015, 30 L. Ed. 949. He cites Westinghouse v. Stanley Co., 133 Fed. 167, 174, 68 C. C. A. 523, 530, in which case he himself had drawn the opinion upon a like question, and had referred to the forceful language which the Supreme Court had uniformly applied "wherever an alleged infringer undertook to prove by oral proofs prior public use or prior invention. Thus the court to that extent gives to a patentee the practical benefit of the presumption arising from the grant of his patent."

In the case at bar the most of the testimony relied upon by the plaintiff is the unassisted memory of witnesses. In the case of Mrs. Verrill's testimony, to which I have referred, she produces certain shoes; but she presents no visible and contemporaneous proofs which speak for themselves as to the time such shoes were made, and, as I have pointed out, her testimony relating to time is not clear or convincing. So, too, in reference to the 10 orders of Verplast to the defendant company for moccasin shoes bearing the number 40–S. Bickford testifies that this 40–S shoe was the same shoe as Exhibit H, the admitted shoe of the defendant; but he produces no visible, contemporaneous shoe of the 40–S variety. He does not even introduce Verplast to testify about the orders or the shoes themselves. Here, again, evidence falls far short of that clear and convincing proof required to defeat a patent.

Upon the whole matter of anticipation in the prior unpatented art I am forced to the conclusion that the defendant has not produced

sufficient evidence to take away from the patentee the "practical benefit of the presumption arising from the grant of his patent."

### Infringement.

The defendant makes a shoe of the moccasin type. Bickford describes the process of making his moccasin substantially as follows: A sole piece and a vamp are first cut, and the inner edge of the vamp is attached to the outer edge of the sole piece by butting the edges together and securing them with a zig-zag stitch. The sole piece does not constitute a full-sized sole, having the size and shape of the bottom of the foot, as shown in the drawing of the patent in suit, and as contained in the plaintiff's shoe; but it consists of the forward portion of such sole, rather narrower than the foot, and extending from the toe to the instep, and having its rear end terminating in a point beneath the instep. The vamp is not a substantial straight piece of leather, as illustrated in the patent in suit, and as shown in the plaintiff's shoe; but it is cut V-shaped, with a wide opening between the ends, in such a manner that, when the pattern is laid down on the stock, it will overlap or interlock the end of one vamp, fitting and nearly filling the hollow space between the ends of the next vamp. In sewing the vamp to the outer edge of the sole piece, the sewing starts at the rear end of the sole piece, and follows around the outer edge and toe, back to the point of beginning. The result of this operation is to cause the vamp to turn up at a considerable angle, but not to stand upright, or at right angles, with respect to the sole piece. An outer sole is now stitched on the under side of the sole piece and vamp, by stitching directly through the outer sole and vamp near the lower or inner edge of the vamp. The last is then introduced; the vamp is shaped up over the sides and toe of the last, and the tip is sewed in as in the Indian moccasin, and also in the Merrill moccasin; that is, the relatively long edge of the vamp is gathered and stitched to the outer edge of the tip.

Mr. Bickford says that the shoe, above described, illustrated by Exhibit H, was given a stock number 40–S by him; that it was put on the market in the fall of 1914, and manufactured and sold by him continuously thereafter.

His principal contention is that his moccasin shoe H, to which the stock number 40–S was given, is an anticipation of the plaintiff's moccasin, and that such anticipation renders the plaintiff's patent invalid. A great part of the testimony in this case has been directed to this issue. The defendant's contention upon this point, with the testimony adduced by him, tends to the conclusion that, if his moccasin shoe H was not an anticipation of the patent in suit, it is an infringement of that patent.

It is, however, necessary to examine further the defense urged by the defendant on the ground of infringement. The defendant contends that there is no infringement, because the piece employed in the defendant's shoe as the starting point is not a "sole," in the language of the patent in suit, but is merely a filler, and does not have the function of the sole, employed by the plaintiff, as set forth in claim 1; in other words, that the defendant does not "secure a vamp to a sole."

The defendant urges, also, that its shoe does not show a vamp which meets the description of the plaintiff's vamp; that the vamp of the plaintiff is straight and of one piece; that the defendant's is V-shaped, and not substantially straight like the plaintiff's; that when it is attached to the sole it does not spring upward in the same way that the plaintiff's does.

Now, when we look at the so-called filler, we find that it does not extend the whole length of the foot. It is the equivalent of the forward end of the sole shown in patent. It is not the ordinary filler found in the shoe art, to which nothing is attached, and which cuts no figure in the construction of the shoe, or as a means of strengthening it. The so-called filler in the defendant's moccasin holds the lower edge of the vamp in place; it is sewn to the vamp; it constitutes the tread or actual bottom of the moccasin and the bearing for the foot. By whatever name it is called, the so-called filler in the defendant's shoe is, in its use, substantially the sole described in the plaintiff's specifications and claims and employed in the plaintiff's moccasin.

[2] With reference to the vamp, the proofs disclose that the vamp of the defendant is substantially the vamp of the plaintiff. The defendant cannot escape infringement by having its vamp in two pieces, for, although the vamp described by the plaintiff in its specifications is in one piece, the specifications themselves refer to a two-piece vamp. The defendant also lays stress upon the fact that, instead of employing a straight piece for a vamp, its vamp is curved or V-shaped, and that it does not turn up to any extent from the horizontal to meet the tip, and to avoid puckering. I think the expert, Mr. Bates, is correct in saying that, in forming the defendant's shoe H, according to the pattern as produced, the vamp must necessarily turn up and achieve substantially the same result, in escaping the puckering, which the plaintiff achieves by his patent. The fact that the curved vamp of the defendant does not get the full advantage from the plaintiff's invention does not prevent it from infringing the patent. An infringer cannot evade liability by diminishing the utility of a device. Penfield v. Chambers Bros. Co., 92 Fed. 630, 34 C. C. A. 579 (Judge Taft). To the extent that the vamp turns up and decreases the puckering it infringes, and attains the benefit of the plaintiff's inventive thought. The defendant's vamp, to be sure, is not straight, like that in the drawing of the patent; but the patentee is not limited to a straight vamp, or to a vamp substantially straight, or to the one-piece vamp, or to the vamp shown in his drawings, so long as he has disclosed it in his patent. The defendant's vamp clearly effects the same result by the same means as the vamp of the plaintiff. The plaintiff's description in his specification clearly covers all that the defendant does in the art; for, when a patentee describes an invention or a machine, he is understood to claim, and does by law cover, not only the precise forms he has described, but all other forms which embody the invention. He may have the whole advantage of his inventive thought, as disclosed by his whole patent. Winans v. Denmead, 15 How. 330, 342, 14 L. Ed. 717; Ives v. Hamilton, 92 U. S. 426, 430, 431, 23 L. Ed. 494; Walker on Patents, §§ 363, 365.

### Conclusion.

I am satisfied that the defendant's method of making its admitted shoe was, step by step, the four elements of the invention set out in claim 1 of the patent in suit. It produces, at least in part, the advantages of the patent in suit, by eliminating the puckering to which attention has been called. It produces, also, the advantages of economy claimed by the plaintiff under his method. It is clearly an infringement of claim 1 of the patent.

The conclusion is, then, that Harry E. Merrill, patentee, was the first and original inventor of the method of constructing moccasin shoes described in his patent and claimed in his five several claims; that the plaintiff's patent in suit is a valid patent; that the defendant has infringed claim 1 of that patent; that the decree must be for the plaintiff. A decree may be entered for an injunction and an accounting.

A decree, consistent with this opinion, may be presented.

The plaintiff recovers costs.